# <u>EXHIBIT 1</u>

# AMERICAN ARBITRATION ASSOCIATION

## Employment Tribunal

In the matter of the arbitration between:

**AAA Case No. 01-24-0002-3683**

**Movement Mortgage, LLC,**

**Claimant,**

**vs.**

**Victor Shkolnikov and**
**Igor Velyunskiy,**

**Respondents.**

## FINAL ORDER

**FINAL AWARD**

**THE EVIDENTIARY HEARING FOR THIS ARBITRATION CASE COMING ON TO BE HEARD** and having been heard from June 8, 2026 through June 9, 2026 via videoconferencing, upon Claimant's Demand for Arbitration and Claim against Respondents and Respondents' Counterclaims against Claimant, the undersigned Arbitrator, H. William Constangy, presiding, upon consideration and review of all pleadings, documents and Exhibits accepted into evidence, the testimony of all witnesses, the

Motions, Briefs and written and oral arguments of Claimant's counsel and pro se Respondents, the relevant and applicable law, the Arbitrator, issues this Final Award with Findings of Fact and Conclusions of Law, requested and agreed upon by the parties, set forth in paragraph 23 of the Management Conference Report and Scheduling Order, dated December 3, 2024, as follows:

1. This American Arbitration Association Employment Arbitration Tribunal has jurisdiction over the subject matter of this case and personal jurisdiction over the parties.

2. This case and all claims asserted herein are arbitrable by the undersigned Arbitrator and this American Arbitration Association Employment Arbitration Tribunal pursuant to the "Mutual Agreement to Arbitrate" between the Claimant and Respondent Victor Shkolnikov, dated March 20, 2022, and the "Mutual Agreement to Arbitrate" between Claimant and Respondent Igor Velyunskiy, dated March 24, 2022 and the consent and agreement of the parties and previous Order of the Arbitrator.

**PROCEDURAL HISTORY**

3. Claimant, Movement Mortgage, LLC, filed a Demand for Arbitration of a claim against a former employee, Respondent Victor Shkolnikov, with the American Arbitration Association (hereinafter referred to herein as "AAA") on February 26, 2024, by and through counsel, Ari Karen, Mitchell Sandler, PLLC.
4. The aforesaid Demand included one claim, to wit: "Breach of Contract":
5. Claimant filed a companion document, referenced in the AAA Demand, with AAA on February 26, 2024, entitled "Statement of Claim" in which the Claimant asserts a claim

for breach of an employment agreement, entitled “Team Leader Employment Agreement”, between Claimant and Respondent Victor Shkolnikov, attached as Exhibit 1, and a compensation agreement, attached as Exhibit 2, incorporated by reference in the employment agreement, for failure to repay an unearned wage advance, referred to in the compensation agreement as a “Start-up Payment”.

6. Claimant, Movement Mortgage, LLC, filed a Demand for Arbitration of a claim against a former employee, Respondent Igor Velyunskiy, with the American Arbitration Association (hereinafter referred to herein as “AAA”) on February 26, 2024, by and through counsel, Ari Karen, Mitchell Sandler, PLLC.

7. The aforesaid Demand included one claim, to wit: “Breach of Contract”:

8. Claimant also filed a companion document with AAA on February 24, 2024, entitled “Statement of Claim” in which the Claimant asserts a claim for breach of an employment agreement, entitled “Team Leader Employment Agreement”, between Claimant and Respondent Igor Velyunskiy, attached as exhibit 1, and a compensation agreement, attached as exhibit 2, incorporated by reference in the employment agreement, for failure to repay an unearned wage advance, referred to in the compensation agreement as a “Start-up Payment”.

9. On or about May 7, 2024, upon an unopposed request by Respondents, AAA consolidated both of the aforesaid cases as “Movement Mortgage, LLC v. Victor Shkolnikov and Igor Velyunskiy”, AAA Case Number 01-24-0002-3683, as captioned hereinabove.

10. On or about May 17, 2024, Paul J. Cherner, KLEIN PAULL HOLLEB and JACOBS, LTD., entered a notice of appearance with AAA as counsel for Respondents.

11. On or about "June ___2024" (*sic*), as dated, Respondent Velyunskiy, by and through counsel, Paul J. Cherner, filed an "Amended Response to Statement of Claim", denying Claimant's breach of contract claim.

12. The undersigned Arbitrator conducted an Initial Management Conference on June 14, 2024, with the parties and their respective counsel, Jessica Feldman, Mitchell Sandler, PLLC, representing Claimant and Matthew Holleb, Klein, Paull, Holleb and Jacobs, Ltd., representing Respondents.

13. On or about June 21, 2024, Respondents submitted Amended Responses, Six Counterclaims and a supporting Brief.

14. The following Counterclaims were submitted: (1) Illegal Contract; Violation of TILA and Regulation Z; (2) Breach of Contract: Reducing Basis Points in Compensation calculation from 225 to 150; (3)Unjust Enrichment: Withholding Loan Originator Compensation; (4) Fraud: False Statements of Material Facts Inducing Respondents to Accept Employment and Close their ongoing Brokerage agency; (5) Breach of Covenant of Good Faith and Fair Dealing: 36 month employment as Invalid Condition for earning start-up payment as wage advance because Claimant employer could control the condition; (6) Violation of Illinois Wage Payment and Collection Act: Clawback of Paid Wages and Failure to pay earned wages.

15. On or about June 28, 2024, Respondent Velyunskiy filed a Second Amended Response.

16. On or about June 21, 2024, Respondents moved to override the aforesaid employment agreement Choice of Law provision, selecting North Carolina law as the governing law in the case for state substantive law issue/

17. After conducting a Hearing On September 6, 2024 and considering the pleadings,

including motions, briefs and arguments of the parties, the Arbitrator issued an **ORDER DENYING RESPONDENTS' MOTION TO OVERRIDE ARBITRATION AGREEMENT CHOICE OF LAW PROVISION** Denying Respondents' Motion.

18. On December 24, 2024, Claimant moved to Dismiss Respondents' Counterclaims.
19. After considering the motions to dismiss and all relevant pleadings, briefs and exhibits and conducting hearing the undersigned and considering arguments of counsel, Arbitrator issued and Order on July 25, 2025, Partially Granting and Partially Denying Claimant's Motion to Dismiss Respondents' Counterclaims, to wit:
20. On or about August 7, 2025, Matthew Holleb, Counsel for Respondents submitted Amended counterclaims, without objection, including, defining and limiting the fraud claim to fraudulent inducement and providing a more definite statement as previously Ordered by the Arbitrator.
21. On or about August 7, 2025, Matthew Holleb, Counsel for Respondents, filed a Motion to substitute alleged violation of the North Carolina Wage and Hour Act in lieu of the Illinois Wage Payment and Collection Act; The motion was unopposed but the proposed amendment was not submitted.
22. On June 10, 2026, the Arbitrator entered a "Procedural Order Providing Guidelines For Submission of Motions For Attorney Fees And Costs". Including, *inter alia*, paragraph 4: "The submission should be presented as a motion for award of attorney fees and costs, including any such applicable law authorizing such fees and costs in this case, and the basis for determining that such attorney fees and costs are reasonable. along with an attached detailed affidavit, itemizing such fees and costs in detail."
23. On April 16, 2026, the Arbitrator entered an "Order Denying Respondents' Oral Pre-

Hearing Requests to Reopen Discovery, Extend The Evidentiary Hearing Date, And To Be Allowed To File A New Counterclaim."

24. The evidentiary hearing for the aforesaid Breach of Contract claims of Claimant and Counterclaims of Respondent came on to be heard and was heard from June 8, 2026, through June 9, 2026.
25. Respondents' counsel withdrew before the evidentiary hearing and Respondents proceeded pro-se.
26. Claimant was represented at the hearing by counsel: Seth Waxman, Mitchell Sandler, PLLC, and Respondents appeared pro-se.
27. With the mutual consent of all parties and without objection, the Hearing was conducted by the Arbitrator via videoconferencing hosted by Optima Juris.
28. Throughout the Hearing, the Arbitrator observed the demeanor of all witnesses, evaluated their truthfulness and credibility, and assessed the probative value of their testimony which is properly reflected in this Award.
29. At the conclusion of the evidence, Claimant's counsel moved for Directed Verdicts on each of the Respondents' Counterclaims, which, upon hearing arguments from both side, were granted on each counterclaim, except for the illegal contract, alleged TILA/Regulation violation counterclaim concerning Loan Originator Compensation.
30. On June 12, 2026, the Arbitrator issued the following Order, memorializing the Directed Verdicts:

> **THIS MATTER CAME BEFORE THE UNDERSIGNED ARBITRATOR,** H. William Constangy, at the conclusion of the presentation of evidence on the second day of a two day evidentiary hearing conducted by the Arbitrator in this

arbitration case, held from June 8, 2026 through June 9, 2026, via Zoom videoconferencing, , co-hosted by Optima Juris and the Arbitrator, and deemed by agreement of the parties to have taken place in Charlotte, Mecklenburg County, North Carolina, and it appearing to the Arbitrator, as follows:

1. Claimant, by and through counsel, Seth Waxman, Mitchell Sandler PLLC, made individual oral motions at the close of all the evidence for Directed Verdicts in favor of Claimant for each of Respondents' six Counterclaims, to wit:
    a. Illegal Contracts: Truth in Lending Act (TILA) Violation. (Count I, Respondents' Amended Counterclaims);
    b. Breach of Contract (Count II, Respondents' Amended Counterclaims);
    c. Unjust Enrichment (Count III, Respondents' Amended Counterclaims);
    d. Fraudulent Inducement (Count IV, Respondents' Amended Counterclaims);
    e. Breach of Contract: Breach of implied Covenant of Good Faith and Fair Dealing (Count V, Respondents' Amended Counterclaims);
    f. Violation of North Carolina Wage and Hour Act (Count VI, substituted for Violation of Illinois Payment and Collection Act, previously Dismissed by Arbitrator).

2. Upon hearing arguments on each motion from Claimant's counsel, Seth Waxman, and pro se Respondent Victor Shkolnikov, on behalf of himself and pro se Respondent Igor Velyunskiy, the undersigned Arbitrator orally Granted the

Claimants' oral Motions for Directed Verdicts in favor of Claimant for each of the aforesaid motions except Count I of Respondents' Amended Counterclaims: Illegal Contracts (TILA Violation) counterclaim, which was Denied.

3. The purpose of this Order is to memorialize the Arbitrator's Oral Orders in regard to the aforesaid counterclaims.

4. This Order will be incorporated in and become a part of the Final Award to be rendered by the Arbitrator in this arbitration case, as appropriate.

5. Findings of Fact and Conclusions of Law, as appropriate, are reserved until the Final Award.

**ORDER**

**Now therefore, it is hereby Ordered, as follows:**

1. Claimant's Motion for Directed Verdict in favor of Claimant for Count I of Respondents' Amended Counterclaims: Illegal Contracts: Truth in Lending Act (TILA) Violation, is **Denied**.

2. Claimant's Motion for Directed Verdict in favor of Claimant for Count II of Respondents' Amended Counterclaims: Breach of Contract, is **Granted** and Respondents' Count II, Breach of Contract counterclaim is **Dismissed with prejudice**.

3. Claimant's Motion for Directed Verdict in favor of Claimant for Count III of Respondents' Amended Counterclaims, Unjust Enrichment, is **Granted** and Count III, Unjust Enrichment counterclaim is **Dismissed with prejudice**.

4. Claimant's Motion for Directed Verdict in favor of Claimant for Count IV of Respondents' Amended Counterclaims: Fraudulent Inducement, is **Granted** and Count IV, Fraudulent Inducement counterclaim is **Dismissed with prejudice**.

5. Claimant's Motion for Directed Verdict in favor of Claimant for Count V of Respondents' Amended Counterclaims: Breach of Contract: Breach of implied Covenant of good faith and fair dealing, is **Granted** and Count V, breach of contract: Breach of implied Covenant of good faith and fair dealing counterclaim is **Dismissed with prejudice**.

**6.** Claimant's Motion for Directed Verdict in favor of Claimant for Respondents' counterclaim for Violation of North Carolina Wage and Hour Act (substituted for Count VI of Respondents' Amended Counterclaims alleging Violation of Illinois Payment and Collection Act, previously Dismissed by Arbitrator) is **Granted** and Respondents' counterclaim for Violation of North Carolina Wage and Hour Act is **Dismissed with prejudice**.

**So Ordered, this the 12th day of June, 2026.**

31. Upon submission of post-hearing briefs and other documents, including Supplemental Briefs, the hearing was closed on July 1, 2026.

## FINDINGS OF FACT

### A. Stipulated Findings of Uncontested Facts

32. Pursuant to the Management Conference Scheduling Order and amendments thereto, on May 20, 2024, the parties submitted the following mutually stipulated "Statement of Uncontested Facts", which were read into the record at the inception of the videoconference hearing on June 8, 2026:

33. On March 21, 2022, Movement and Shkolnikov entered into an Employment Agreement (the "Shkolnikov Employment Agreement"), pursuant to which Shkolnikov became a Movement Team Leader.

34. On March 21, 2022, Movement and Shkolnikov entered into a Compensation Schedule (the "Shkolnikov Compensation Schedule"), which was incorporated into the Shkolnikov Employment Agreement as Exhibit A.

35. On March 20, 2022, Movement and Shkolnikov entered into an Arbitration Agreement (the "Shkolnikov Arbitration Agreement").

36. On March 24, 2022, Movement and Velyunskiy entered into an Employment Agreement (the "Velyunskiy Employment Agreement"), pursuant to which Velyunskiy became a Movement Team Leader.

37. On May 3, 2022, Movement and Velyunskiy entered into a Compensation Schedule (the “Velyunskiy Compensation Schedule”), which was incorporated into the Velyunskiy Employment Agreement as Exhibit A.

38. On March 24 2022, Movement and Velyunskiy entered into an Arbitration Agreement (the "Velyunskiy Arbitration Agreement").

39. Respondents were responsible for, and in charge of, Movement’s branch located in Chicago, Illinois, which was made up of Respondents and a team of loan officers they brought with them to Movement.

40. Pursuant to the Shkolnikov Compensation Schedule, Movement paid Shkolnikov a Start-up Payment of $835,000, which was paid on the first pay date for the pay period in which Shkolnikov started his employment with Movement.

41. Pursuant to the Velyunskiy Compensation Agreement, Movement paid Velyunskiy a Start-up Payment of $400,000, which was paid on the first pay date for the pay period in which Velyunskiy started his employment with Movement.

42. Pursuant to Respondents’ Compensation Schedules, their Start-up Payments were defined as:

> An unearned advance of wages which shall not be deemed earned by employee until completion of thirty-six (36) consecutive months of employment with Movement unless an alternate date is specifically identified. A Start-up Payment shall not be offset against Commission or Override unless separation of employment occurs for any reason within the first thirty-six (36) months of employment (or alternative specified date), at which point any outstanding dollar amount up to the full amount of the Start-up Payment shall be due and payable back to Movement within thirty (30) days from employee’s last full day of employment with Movement.

Respondents’ Compensation Schedules at 3.

43. Respondents' Compensation Schedules further provided:

> **<u>Notice of Obligation to Repay Unearned Advances and Commissions</u>**: Your compensation may include unearned advances in the form of . . . Start-up Payments . . . . By signing this Exhibit A to Movement's Offer Letter, you are expressly agreeing that you will repay these unearned amounts to Movement within thirty (30) days of your last full day of employment if they remain unearned at the time a separation of employment occurs for any reason.

*Id*. at 4.

44. Respondents' Compensation Schedules further provided that Respondents' compensation "[i]ncludes unearned advances that you must repay if there is a separation of employment described in the Definitions." *Id*. at 5.

45. Respondents' Compensation Schedules further provided that "[t]he requirement that employees be employed by Movement for thirty-six (36) months before any Guaranteed Amounts and Start-up Payments are earned is intended to serve in part as an incentive for employees to remain employed by Movement." *Id*. at 7.

46. Respondents' Start-up Payments totaling $1,235,000, were one-time payments that were provided to Respondents at the outset of their employment. These payments were not affected, or governed, by TILA and were unrelated to the monthly compensation Respondents received throughout the remainder of their employment.

47. Respondents' compensation was calculated in accordance with their Compensation Schedules, which defined their monthly compensation as "Net Assigned Revenue." *See id*. at 1 ("Assigned Revenue Override" definition). Net Assigned Revenue was defined as:

> The "Net Assigned Revenue" is determined by subtracting all Branch Expenses from the Monthly Assigned Revenue . . . . The "Monthly Assigned Revenue" is calculated by applying the "Monthly Assigned Revenue Rate" listed on page 5 of this Exhibit A to the total monthly loan volume of the Branch.

*Id.* at 1.

48. Respondents' Employment Agreements stated, "Employee's primary duty shall be to solicit and originate residential mortgage loans for and on the Company's behalf . . . ."

49. Respondents' Compensation Schedule stated in the "Additional Notes" section, "You must cease all origination activities immediately prior to and during any period for which you will be paid according to this Exhibit A."

50. During the course of Respondents' employment, their Assigned Revenue Rate was 225 basis points for the first month and then 150 basis points for the remaining months of their employment. *See* Movement Exhibit List (Exhibit 13 Spreadsheet) at Line 12 ("Assigned Revenue (bps)"). Respondents' Monthly Loan Volume is denoted in the spreadsheet. *See id.* at Line 9 ("Volume"). Respondents' Assigned Revenue Rate was multiplied by the Respondents' monthly loan volume to calculate Respondents' Assigned Revenue. *See id.* at Line 12 ("Assigned Revenue (bps)"). Respondents also earned monthly Fee Revenue. *See id.* at Line 17 ("Fee/Int Inc. Rev"). Respondents' expenses were then subtracted to calculate Respondents' Employee Profit Share. *See id.* at Line 22 ("Employee Profit Share").

For example, in May 2022:

- Respondents' Assigned Revenue Rate was 150 bps. *See id.* at Line 12, Column C;

- Respondents' Loan Volume was $8,348,292. *See id.* at Line 9, Column C;

- By multiplying those two numbers together, Respondents' Assigned Revenue was $125,224. *See id.* at Line 16, Column C;

- Respondents' Fee Revenue was $39,895. *See id*. at Line 16, Column C;

- Respondents' expenses were $209,374. *See id*. at Line 19, Column C;

- By subtracting Respondents' expenses ($209,374) from the combination of their Assigned Revenue ($125,224) and Fee Revenue ($39,895), Respondents' Employee Profit Share was negative $44,255. *See id.* at Line 22, Column C.

51. During the course of Respondents' employment, their expenses exceeded the combination of their Assigned Revenue and Fee Revenue every month, culminating in a total Employee Profit Share of negative $459,928, by the time their employment ended. *See id.* at Line 22, Column M.

52. Movement's overall profit/loss was also denoted in the Spreadsheet. *See id.* at Line 31 ("Movement Profit Over/Under"). For May 2022, Movement's profit/loss was negative $31,673. *See id.* at Line 31, Column C. For the entirety of Respondents' employment, Movement's profit/loss was negative $350,281. *See id.* at Line 31, Column M.

53. Prior to being hired by Movement, Respondents' historically generated an average of $36 million per month in loan volume.

54. During the course of Respondents' employment at Movement, Respondents generated an average of approximately $4 million per month in loan volume.

55. On March 23, 2023, Movement terminated Respondents, twelve months into their thirty-six-month commitment prescribed by the Start-up Payment provision.

56. To date, Respondents have not repaid any of the Start-up Payments they received.

57. Respondents' Employment Agreements contain severability provisions, stating:

> Employee and the Company agree that this Agreement shall be severable, meaning that if any part of any provision is held to be unenforceable, it shall not affect the validity or enforceability of the remainder of the terms and provisions of this Agreement.

Respondents' Employment Agreements at ¶ X(D).

58. Respondents' Employment Agreements state:

> The Company reserves the right to review Employee's performance, the relevant market, and the Company's overall performance and adjust Employee's compensation. Such adjustment, if any, will be based on the long term performance of the loans originated by Employee, the pull through rate of Employee's loan files, the number of times on average Employee's files have to go through underwriting, the overall residential mortgage market relevant to Employee, the loan volume originated by Employee and the conversion rate of Employee's pipeline. The Company reserves the right to make any changes to commission/compensation, in its sole discretion, which shall be effective as to loans originated after thirty (30) days' written notice to Employee. Employee's commission rate cannot be changed more than once in any six (6) month period.

Respondents' Employment Agreements at ¶ III(B).

59. Respondents were compensated pursuant to the terms of their Employment Agreements and Compensation Schedules.

60. Respondents' Employment Agreements contain merger clauses, stating:

> This Agreement sets forth the entire understanding and agreement of the Parties hereto and fully supersedes any and all prior or contemporaneous agreements or understandings between the Parties with respect to the subject matter hereof.

> No prior negotiations or drafts of this Agreement shall be used by either Employee or the Company to construe the terms or to challenge the validity hereof.

Respondents' Employment Agreements at ¶ X(A).

61. Respondents' Employment Agreements contain modification provisions, stating:

> This Agreement may not be modified except in writing between all Parties hereto. No oral promises, assurances, agreements, or understandings either prior or subsequent to the execution of this Agreement are binding or may be relied upon except and unless incorporated herein or incorporated by written modification as permitted herein.

Employment Agreement ¶ X(B).

62. Neither Respondents' Employment Agreements nor their Compensation Schedules contain any provision relating to charitable contributions.

**B. Additional Findings of Fact**

63. Respondents employment with Claimant was "at will", as expressly set forth in the first paragraph of each of their aforesaid "Team Leader Employment Contract": "Employee acknowledges that Employee is employed at will and that either the Company or Employee may terminate this Agreement at any time for any or no reason, with or without cause."

64. The first paragraph of each of the Respondents' "Compensation Schedule", incorporated by reference in their aforesaid employment agreements as Exhibit A to their respective employment offer letters, reiterates the "at will" nature of their employment: "Nothing contained in this in this Exhibit affects the "at will" status of your employment with movement."

65. It is undisputed and uncontested by the parties that Respondents were each "at will" employees.

66. Each of the aforesaid employment agreements is severable, as expressly set forth sub-paragraph D of Section X, "Miscellaneous" of the employment agreements: "Employee and the Company agree that this agreement shall be severable, meaning if any part of any provision is held to be unenforceable, it shall not affect the validity of or enforceability of the remainder of the terms and provisions of this Agreement."

67. The severability of the terms and provision of the aforesaid agreement is undisputed and uncontested.

68. Each of the Respondents was compensated at the assigned revenue rate of static basis points of 225 for the first month and 150 basis points for each month thereafter ,multiplied by the  total loan volume less Branch expenses for the net Assigned Revenue Rate per the terms of the aforesaid compensation schedules.

69. Branch expenses, as set forth in the aforesaid compensation

Schedules consisted of the following:

> "Branch Expenses" include (i) compensation of Branch employees; (ii) taxes, licensing, recruiting, training, and hiring costs; (iii) insurance and government fund contributions; (iv) equipment; (v) supplies; (vi) the cost of any building or rent leases, modifications, or repairs; (vii) any and all third party vendor services; (viii) all costs associated with obtaining or renewing state licenses or adding investors; (ix) any and all compliance, legal, and regulatory costs associated with Branch operations; (x) any and all penalties, losses, or costs (including among others reasonable attorneys' fees) associated with the Branch, including but not limited to early

payment defaults, early pay offs, recaptures, repurchases, fraud, liabilities, judgments, damages, or reasonable costs of settlement; (xi) any marketing costs beyond base M3 access; (xii) corporate coaching; (xiii) any costs of sales incentive trips, including but not limited Movement Mortgage's President's Club, attributable to you or other Branch employees in the event Movement Mortgage in its sole discretion deems you eligible to attend any sales incentive trips; (xiv) a flat administrative charge applicable to all loans originated at the Branch; and (xv) and any allocations/contributions to meet or maintain the Reserve Account, as defined herein.

## CONCLUSIONS OF LAW

## GOVERNING LAW

70. Pursuant to Paragraph 5 of the Management Conference Report and Scheduling Order adopted by the parties, "the law of North Carolina law shall govern all state substantive issues...."

71. Pursuant to each of the Arbitration Agreements of the parties: "The Arbitrator will apply the law of the State of North Carolina to any matter brought before him or her pursuant to the Agreement," (Section 8, Arbitrator Authority).

72. Pursuant to each of the Employment Agreements of the parties: "The parties agree that this Agreement will be interpreted in accordance with North Carolina law." (VIII. Choice of Law and Forum/Jurisdiction.

73. Pursuant to Arbitrator's "ORDER DENYING RESPONDENTS MOTION TO OVERRIDE CHOICE OF LAW PROVISIONS IN PARTIES' ARBITRATION AND EMPLOYMENT AGREEMENTS", entered November 1, 2024: "North Carolina law is and shall be the governing law in this arbitration case, as selected by the parties

in their respective arbitration and employment contracts referred to hereinabove."

**CLAIMANT'S BREACH OF CONTRACT CLAIM**

74. Under North Carolina law, the elements of a breach of contract claim are a valid contract and breach of the terms of the contract. (*Advisor Law, LLC v. Holland*, 927 S.E.2d 39, 44 (N.C. Ct. App. 2026)"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 536, 551 S.E.2d 546, 554 (2001) (internal quotation marks and citation omitted);*Soc'y for the Hist. Pres. of the Twentysixth N.C. Troops, Inc. v. City of Asheville*, 282 N.C. App. 701, 707, 872 S.E.2d 134, 140 (2022):

> The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citation omitted). The "elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Se. Caissons, LLC v. Choate Constr. Co.*, 247 N.C. App. 104, 110, 784 S.E.2d 650, 654 (2016) (citing *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980));

75. Claimants have the burden of proof in regard to the contract being valid and that the Respondents breached the terms of the contract. (*Soc'y for the Hist. Pres. of the Twentysixth N.C. Troops, Inc. v. City of Asheville*, 282 N.C. App. 701, 707, 872 S.E.2d 134, 140 (2022): "Generally, a party seeking to enforce a contract has the

burden of proving the essential elements of a valid contract." *Murray v. Deerfield Mobile Home Park, LLC*, 2021-NCCOA-213, ¶ 36, 277 N.C. App. 480, 860 S.E.2d 323 (citation and quotation marks omitted), *review dismissed*, 378 N.C. 366, 860 S.E.2d 921, and *review denied*, 378 N.C. 366, 861 S.E.2d 330 (2021)."

76, Movement indisputably paid Respondents a combined $1,235,000 in Start-up Payments at the outset of their employment, to wit: $835,000 to Shkolnikov and $400,000 to Velyunskiy. *See* Respondents' Compensation Schedules Exhibits 1 and 6 at Page 5; *see also* Statement of Undisputed Facts at ¶¶ 8 and 9.

77. In exchange for payment of the unearned advances,, Respondents indisputably agreed that their Start-up Payments constituted unearned advances that would not be deemed earned until completion of thirty-six consecutive months of employment. *See* Exhibits 1 and 6 at Pages 3-4 ("Start-up Payment" definition and Repayment Obligation); *see also* Statement of Undisputed Facts at ¶¶ 10-12.

78. Respondents further indisputably agreed that if they separated from Movement **for any reason** within that thirty-six-month period, the full amount of the Start-up Payments would be due and payable back to Movement within thirty days. *See* Exhibits 1 and 6 at Pages 3-4 (emphasis added); *see also* Statement of Undisputed Facts at ¶¶ 10 and 11.

79. Under North Carolina law, courts enforce contracts, including employment contracts, by their plain language. *See Williams v. Habul*, 219 N.C. App. 281, 292 (2012) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.") (quoting *Walton v. City of Raleigh*, 342 N.C. 879, 881 (1996)); *see also Hickox v. R&G Grp. Int'l, Inc.*, 161 N.C. App. 510, 513 (2003) (interpreting employment contract by its plain language).

Movement expressly stated in writing in the Compensation Schedule–which Respondents signed at the outset of their employment–that the Start-Up Payment had to be paid back if they were terminated "for any reason" prior to 36 months, *see* Exhibit 1 (Compensation Schedule) at 3-4, and Respondents recently reaffirmed that contractual obligation in the Statement of Undisputed Facts. Exhibit 15 at ¶¶ 10-13.

80. It is undisputed that each of the Respondents' Team Leader Employment Agreements and incorporated by reference Compensation Schedules are valid contract and that Respondents breached the express terms of those contracts by failing to repay Claimant the unearned advance of $835,000 to Respondent Shkolnikov and $400,000 to Respondent Velyunskiy plus accrued interest as specified in the respective contracts.

**81.** Claimant has fully carried its burden of proof and therefore, its claim against Respondents for repayment of the aforesaid advances should be and is **Granted.**

## RESPONDENT'S AMENDED COUNTERCLAIMS

82. On or about August 7, 2025, Respondents filed Amended Counterclaims to provide a more definite statement of COUNT IV: Fraudulent Inducement and a Motion to Amend COUNT VI, without objection,  therein from violation of the Illinois Wage Payment and Collection Act to violation of the North Carolina Wage and Hour Act.

83. Although the Motion to Amend the aforesaid Count IV, no amendment thereto was filed.

**Count I: : Illegal Contract: Truth in Lending Act (TILA) Violation**

**TILA Compliance under Loan Originator Compensation Rule and  Consumer Finance Protection Bureau Regulation Z**

84. The federal Truth in Lending Act provides as follows:

> For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal).

85. The calculation of Respondents; monthly ongoing wage compensation is squarely within the rule set forth in the Consumer Finance Bureau Regulation Z:

> Prohibited payments to loan originators.
> **(1)** Payments based on a term of a transaction
> **(i)** Except as provided in paragraph (d)(1)(iii) or (iv) of this section, in connection with a consumer credit transaction secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction, the terms of multiple transactions by

an individual loan originator, or the terms of multiple transactions by multiple individual loan originators. If a loan originator's compensation is based in whole or in part on a factor that is a proxy for a term of a transaction, the loan originator's compensation is based on a term of a transaction. A factor that is not itself a term of a transaction is a proxy for a term of the transaction if the factor consistently varies with that term over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop, or change the factor in originating the transaction.

**(ii)** For purposes of this paragraph (d)(1) only, a "term of a transaction" is any right or obligation of the parties to a credit transaction. The amount of credit extended is not a term of a transaction or a proxy for a term of a transaction, provided that compensation received by or paid to a loan originator, directly or indirectly, is based on a fixed percentage of the amount of credit extended; however, such compensation may be subject to a minimum or maximum dollar amount.

(12 C.F.R. § 1026.36 (Lexis Advance through the July 10, 2026 issue of the Federal Register, with the exception of the amendments appearing at 91 FR 42313, 91 FR 42794, 91 FR 42666, 91 FR 42658 and 91 FR 42659).

86. The Official Interpretations (Supplement I to Part 1026), Comment 36(d)(1)-9 confirms that calculating the Respondent loan originator compensation based on multiplying a fixed percentage by the volume of loan principal satisfies TILA requirements:

9. *Amount of credit extended.* A loan originator's compensation may be based on the amount of credit extended, subject to certain conditions. Section 1026.36(d)(1) does not prohibit an arrangement under which a loan originator is paid compensation based on a percentage of the amount of credit extended, provided the percentage is fixed and does not vary with the amount of credit extended.

(Official Interpretations, 12 C.F.R. pt. 1026, Supp. I, Comment 36(d)(1)-9)

87. Comment 36(d)(1)-2.i.A, provides as follows:

> i. *Permissible methods of compensation*. Compensation based on the following factors is not compensation based on a term of a transaction or a proxy for a term of a transaction:
>
> A. The loan originator's overall dollar volume (*i.e.,* total dollar amount of credit extended or total number of transactions originated), delivered to the creditor. See comment 36(d)(1)-9 discussing variations of compensation based on the amount of credit extended.

(Official Interpretations, 12 C.F.R. pt. 1026, Supp. I, Comment 36(d)(1)-2.i.A).

88. Comment 36(d)(1)-6 confirms that Claimant's single change in the static basis points in 12 months is TILA compliant: "6. *Periodic changes in loan originator compensation and terms of transactions*. Section 1026.36 does not limit a creditor or other person from periodically revising the compensation it agrees to pay a loan originator." ((Official Interpretations, 12 C.F.R. pt. 1026, Supp. I, Comment 36(d)(1)-6).

89. Respondents bear the burden of proving their counterclaim by a preponderance of the evidence. See, e.g., Turner v. Ellis, 633 S.E.2d 883, 888- 889 (N.C. Ct. App. 2006), review denied, 361 N.C. 370 (2007); Adams v. Bank United of Tex., 606 S.E.2d 149, 154 (N.C. Ct. App. 2004); Redding v. Shelton's Harley Davidson, Inc, 534 S.E.2d 656, 659 (N.C. Ct. App. 2000).

90. Respondents failed to carry the burden of proving any aspect of their Illegal Contract/ Truth in Lending Act ("TILA") violation counterclaim.

91. Respondents' monthly compensation was entirely TILA compliant.

92. It is undisputed that Respondents' monthly compensation was determined by a basic mathematical calculation: multiplying their monthly loan volume by a static basis point Assigned Revenue Rate minus expenses. See Claimant's Exhibits 1 and 6 Respondents' (Compensation Schedules) at Page 1; see Statement of Undisputed Facts at ¶¶ 15 and 18).

93. To establish a TILA violation, Respondents were required to prove that their monthly compensation varied based upon the terms of the loans they sold to customers. See 15 U.S.C. § 1639b(c)(1) ("For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal.")) (emphasis added); 12 C.F.R. § 1026.36(d)(1)(i) ("in connection with a consumer credit transaction secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction . . . .") (emphasis added).

94. TILA specifically excludes Respondents' principal loan volume from consideration, see 15 U.S.C. § 1639b(c)(1) (excluding the "amount of the principal"), and Respondents' expenses are also irrelevant to TILA.

95. The only variable in Respondents' monthly compensation calculation subject to TILA is their assigned revenue rate. Movement's 30(b)(6) witness, Kevin Jardina

("Jardina"), a Finance Manager employee of Claimant, unequivocally testified that Respondents' assigned revenue rate did not vary based upon the terms of the loans sold to customers:

> Q: The monthly assigned revenue rate, what is it listed there as? A: 225 basis points. Q: Okay.· And if you can bring up -- well, let me ask you before we bring up another -- that assigned revenue rate, the 225, that was for all the loans, for example, that were closed in the month of April 2022; is that right? A: Yes. Q: How often or how much did that assigned revenue rate change that month based on the individual terms of the loans that the respondents closed with individual customers? Did it vary? A: It did not. Q: So if the respondents closed a loan with Joe - John Doe and that rate -- the interest rate in that loan was 4.5 percent or 5.5 percent or 6.5 percent, would that have any impact on that assigned revenue rate? Would it remain the same or would it change? A: No, it would change. Or, sorry. It – it would remain -- sorry.· It would remain the same. The 225, no matter what rate they are -- they are selling to the customer would be at 225. 11 Q: I see. And if the fees or the discount points or whatever else with regards to the customers, would those change or modify that 225 basis points that was given to them during the month of April 2022? Would that -- would that change at all based on those other terms of the individual loans? A: No, it would not. * * * Q: So once it went down to 150, this is saying, once it's at 150, you can't base the compensation that's given to them based on the terms of the loans with the consumers, correct? A: Yes, that's correct. Q: Was that -- did that 150 vary in any month to follow in the remainder of their employment based on any of the terms that went to the customers? A: It did not. Q: So if a customer in May, June, July, August, you pick the month -- if their customer was getting 4.5 percent interest rate or 7.5 percent interest rate, did that have any effect on that 150 basis points? A: It did not. Q: And how about fees charged to customers, if they went up or down, did that have any impact on the 150? A: It did not. Q: Discount points or any other term of the loan between the respondents and the customers, did that ever change the 150 that went into that math calculation? A: No,

> it did not. (Arbitration Hearing Transcript ("Tr.") at 134-135, 152 (emphasis added)).

96. As Mr. Jardina's unimpeached testimony established, Respondent's monthly compensation never varied based on the terms of the loans they sold to customers.
97. No evidence or argument was offered by Respondents at the evidentiary hearing that any of the stipulated branch expenses were proxies for payment or calculation of loan originator wages based on terms of a mortgage loan.

**Effect of One-time Adjustment of Assigned Revenue Rate**

98. TILA and Respondents' Employment Agreements expressly permit Movement to periodically adjust Respondents' assigned revenue rate based on performance and other legitimate business considerations.
99. TILA's official commentary states, as follows:

> Periodic changes in loan originator compensation and terms of transactions. Section 1026.36 does not limit a creditor or other person from periodically revising the compensation it agrees to pay a loan originator. However, the revised compensation arrangement must not result in payments to the loan originator that are based on the terms of a credit transaction. A creditor or other person might periodically review factors such as loan performance, transaction volume, as well as current market conditions for loan originator compensation, and prospectively revise the compensation it agrees to pay to a loan originator. 12 C.F.R. pt. 1026, Supp. I, cmt. 36(d)(1)-6 (2025) (emphasis added).

100. Mr. Jardina's testimony discussing this provision was unchallenged:

> Q: [T]his is 12 CFR Part 1026 Supplement 1, Comment 36D1- 6. It states, "Periodic changes in loan originator compensation and terms of transactions."· Q. That's what this comment is about; is that right? A: Yes. Q: It says, "Section 1026.36 does not limit a creditor or other person from periodically revising the compensation it agrees to pay a loan originator." That's what it says, right? A: Yes. Q: So under that sentence alone, is it okay for Movement to adjust their compensation periodically? A: Yes, it is. Q: And so going from 225 to 150, is that perfectly acceptable? A: It is. Q: This comment goes on to say, "However, the revised compensation arrangement must not result in payments to the loan originator that are based on the terms of a credit transaction."· That's what it says, right? A: Yes. Q: So once it went down to 150, this is saying, once it's at 150, you can't base the compensation that's given to them based on the terms of the loans with the consumers, correct? A: Yes, that's correct. 14 Q: Was that -- did that 150 vary in any month to follow in the remainder of their employment based on any of the terms that went to the customers? A: It did not. (Tr. at 151-152; See also Claimant's Exhibit 29. listing key TILA provisions).

101. The Consumer Financial Protection Board ("CFPB" or the "Board") states:

> The Bureau further notes that the permissible methods of compensation to be calculated with reference to and applied to multiple transactions should be considered together with existing comment 36(d)(1)-6 that provides interpretation of "periodic changes in loan originator compensation." That comment gives as an example 6 months as a permissible period for revising compensation after considering multiple transactions and other variables over time.
> (Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 11,280, 11329 (Feb. 15, 2013) (emphasis added)).

102. Movement changed Respondents' compensation only once in 12 months.

103. Respondents' Employment Agreements endorsed such changes in compensation, and Respondents reaffirmed that provision in the Statement of Undisputed Facts:

> The Company reserves the right to review Employee's performance, relevant market, and the Company's overall performance and adjust Employee's compensation. Such adjustment, if any, will be based on the long term performance of the loans originated by Employee, the pull through rate of Employee's loan files, the number of times on average Employee's files have to go through underwriting, the overall residential mortgage market relevant to Employee, the loan volume originated by Employee and the conversion rate of Employee's pipeline.

(Exhibits 2 and 7, Employment Agreements) at III(B) (emphasis added).( Statement of Undisputed Facts at ¶ 26; see also Exhibit 1 and 6 (Compensation Schedules) at 7 (Additional Notes) 16 :

> Prospective Compensation Adjustments. Employee's compensation will not as a matter of course be reviewed or adjusted and may not be adjusted more than once in any three (3) month period . . . . In the event an employee's compensation is evaluated for adjustment, a variety of criteria including pull through rate, quality of loan files, loan volume, seniority, overall sources of origination, loan performance, any relevant competitive forces impacting employee's customer base, and any relevant market economic trends will be reviewed.

**Severability**

104. Respondents' Start-Up Payments are Standalone Obligations that are Divisible and Severable from their Monthly Compensation.

105. It is undisputed that Movement's breach of contract claim relating solely to Respondents' Start-up Payments is entirely unrelated to, and divisible from, their monthly compensation, which plays no role in Movement's cause of action.

106. The Start-up Payments were fixed, lump-sum payments made at the outset of Respondents' employment as retention incentives. (See Exhibits 1 and 6 (Compensation Schedules) at 3-5, 7; see also Statement of Undisputed Facts at ¶¶ 8-14).

107. The aforesaid Start-up Payments were not calculated by reference to any loan terms, did not vary based on any loan characteristic, and were entirely independent of whether Respondents ever originated a single mortgage loan. Id. The payments were made before Defendants had originated a single loan for Movement.

108. Respondents affirmatively stipulated that their Start-up Payments were "not affected, or governed, by TILA" and were "unrelated to the monthly compensation": Respondents' Start-up Payments totaling $1,235,000, were one-time payments that were provided to Respondents at the outset of their employment.

109. These payments were not affected, or governed, by TILA and were unrelated to the monthly compensation Respondents received throughout the remainder of their employment. Exhibit 15 (Statement of Undisputed Facts) at ¶ 14 (emphasis added).

110. Movement is not seeking any relief whatsoever relating to Respondents' monthly payments. Movement's claim is solely for return of the Start-up Payments.

111. Under North Carolina law, "'a contract is entire, and not severable, when by its terms, nature and purpose it contemplates and intends that each and all of its parts, material provisions, and the consideration, are common each to the other and interdependent.'" *Kornegay v. Aspen Asset Group, LLC*, 204 N.C. App. 213 (2010), citing *Mebane Lumber Co. v. Avery & Bullock Builders, Inc.*, 270 N.C. 337, 341, 154 S.E.2d 665, 668 (1967) (quoting *Wooten v. Walters*, 110 N.C. 251, 254, 14 S.E. 734, 735 (1892)). On the other hand, "'a severable contract is one in its nature and purpose susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor is it intended by the parties that they shall be.'" Id. at 342, 154 S.E.2d at 668 (quoting *Wooten*, 110 N.C. at 255, 14 S.E. at 735). When a contract is severable, "'an action may be maintained for a breach of it in one respect and not necessarily in another, or for several breaches, while in other material respects it remains intact.'" Id. (quoting *Wooten*, 110 N.C. at 255, 14 S.E. at 735). Id. at 226-227 (emphasis added).

112. Respondents' Employment Agreements contain severability clauses: "Employee and the Company agree that this Agreement shall be severable, meaning that if any part of any provision is held to be unenforceable, it shall not affect the validity or enforceability of the remainder of the terms and provisions of this Agreement. (Claimant's Exhibits 2 and 7 (Employment Agreements) at X(D)).

113. North Carolina courts agree that severability provisions should be enforced according to their terms. In *Southland Nat'l Ins. Corp. v. Lindberg*, 889 S.E.2d 512 (N.C. Ct. App. 2023), the Court stated:

> [T]his Court has held that a contract may be severable when it has two or more parts that are 'not necessarily dependent on each other, nor is it intended by the parties that they shall be.'" *Kornegay v. Aspen Asset Group, LLC*, 204 N.C. App. 213, 226, 693 S.E.2d 723, 734 (2010) (quoting *Mebane Lumber Co.*, 270 N.C. at 342, 154 S.E.2d at 668). A court may sever an unenforceable provision and enforce the balance of the contract only when the other provisions "are in no way dependent upon the enforcement of the illegal provisions for their validity." *Am. Nat'l Elec. Corp.*, 167 N.C. App. at 101, 604 S.E.2d at 317. While not determinative, the decision to include a severability clause in an agreement may provide general guidance when determining the parties' intent. See *Sheffield v. Consolidated Foods Corp.*, 302 N.C. 403, 421-22, 276 S.E.2d 422, 434-35 (1981) ("[A] severability is relevant to a decision only when the validity of a particular provision of the Act is at issue."); see also 15 Williston on Contracts § 45:6 (4th ed) ("The parties' intent to enter into a divisible contract may be expressed in the contract directly, through a so-called 'severability clause[.]' "). *Southland* at 519-520.

114. Respondents' Compensation Schedules show that the Start-up Payments are wholly independent of Respondents' monthly compensation, see Exhibit 1 (Compensation Schedules) at 3-4).

115. Respondents reaffirmed that contractual distinction in the Statement of Undisputed Facts. (See Claimant's Exhibit 15 at ¶¶ 10-13).

116. Respondents stipulated that the Start-up Payments are "not affected, or governed, by 9 TILA."

117. The aforesaid Respondents' respective Employment Agreements contain severability provisions confirming the parties' intent that the Start-up Payments repayment obligation remains enforceable even if another contractual provision is deemed invalid.( See Exhibit 2 (Employment Agreements) § X(D).

118. Under North Carolina law, even if the compensation provisions were a violation of TILA, : "Where a contract contains both legal and illegal provisions, the legal may be enforced if they are severable from the illegal." Hall v. Sinclair Refining Co., 242 N.C. 707, 709, 89 S.E.2d 396, 398 (1955).

119. Based on the foregoing, Respondents have failed to carry their burden of proof on the aforesaid Count I of the Respondents Amended Counterclaim: Illegal Contracts, claiming Respondents employment and compensation agreements with Claimant were illegal, based on alleged Truth in Lending Act violations, and therefore, should be and is **DENIED** and **DISMISSED WITH PREJUDICE**.

**Count II: Breach of Contract: Adjustment of Static Basis Points**

120. Respondents contend that Claimant's one-time adjustment of static basis points used to calculate their respective monthly compensation constituted breach of their respective compensation schedules.

121. The aforesaid Respondents' employment agreements, on their face, reserve Claimant's right to make such adjustments, and refute that such reduction was a breach of their respective agreements, as stipulated by the Respondents:

> Respondents' Employment Agreements state:
> The Company reserves the right to review Employee's performance, the relevant market, and the Company's overall performance and adjust Employee's compensation. Such adjustment, if any, will be based on the long term performance of the loans originated by Employee, the pull through rate of Employee's loan files, the number of times on average Employee's files have to go through underwriting, the overall residential mortgage market relevant to Employee, the loan volume originated by Employee and the conversion rate of Employee's pipeline. The Company reserves the right to make any changes to commission/compensation, in its sole discretion, which shall be effective as to loans originated after thirty (30) days' written notice to Employee. Employee's commission rate cannot be changed more than once in any six (6) month period.

122. No evidence to the contrary was offered at the evidentiary hearing by Respondents witness or exhibits accepted into evidence.

123. Respondents have failed to carry their burden of proof to support this counterclaim, and therefore Directed Verdict Denying Respondents Amended Counterclaim Count II: Breach of Contract and Dismissing this counterclaim with prejudice was Granted.

**Count III: Unjust Enrichment**

124. Respondents contend in their Amended Counterclaim that Claimant was unjustly enriched because neither of them was not provided wage compensation for the loans that they originated, applying the calculations for determining such

compensation provided in underlying employment and compensation schedules between Claimant and each Respondent.

125. “A claim for unjust enrichment is "’a claim in quasi contract or a contract implied in law.’" *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554 (1988). "The claim is not based on a promise but is imposed by law to prevent an unjust enrichment." Id. As such, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." Id. To establish a claim for unjust enrichment, a plaintiff must prove that: (1) the plaintiff conferred a benefit on another party; (2) the other party consciously accepted the benefit; and (3) the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Se. Shelter Corp. v. BTU, Inc.,* 154 N.C. App. 321, 330, 572 S.E.2d 200 (2002) (citing *Booe*, 322 N.C. at 570).*Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting,* LLC, No. 68A25, 2026 LX 275976, at *51-52 (May 22, 2026);*Concrete Co. v. Lumber Co*., 256 N.C. 709, 124 S.E. 2d 905 (1962). *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).

126. Since it is undisputed that there are underlying employment and compensation contracts between the parties that set forth the formula for calculating loan originator compensation, an implied contract for unjust enrichment based on those express contract provisions is not recognized in North Carolina.

127. Based on the foregoing, a Directed Verdict was Granted, dismissing Respondent’s claim for unjust enrichment with prejudice.

**Count IV: Fraudulent Inducement**

128. Respondents contend that each of them was fraudulently induced by Claimant to give up their ongoing Refinance business in Chicago and enter into the aforesaid employment agreements by fraudulent pre-signing misrepresentations by Claimant:

a. Statements that recoupment of start-up payments paid to Respondents applied only if they left voluntarily.

b. Statements about the speed of the Claimant's underwriting capability.

c.. Statements allegedly made (1) by Matthew Schoolfield, one of Claimant's Divisional Leaders, during a pre-signing telephone conference on February 24, 2002 with Respondents about Claimant's unlimited contributions by the Claimant; Statements made by Mr. Schoolfield and former President of Claimant, during dinner on February 28, 2022, regarding Claimant's matching policy; (3) Statements made by Claimant's CEO, on March 1, 2022, "discussing" Claimant's unlimited matching policy. (Respondents Amended Counterclaims.

129. Claimant's only witness, Kevin Jardina testified that there was no cap on the number of years that matching donations could be claimed while employed. (Evidentiary Hearing Transcript,

130. Respondents' only witness, Matthew Schoolfield, testified he was present when the CEO of the Claimant company discussed charitable contributions with Respondents. .

131. Mr. Schoolfield further testified that there were no caps at that time.

132. No evidence was offered at the evidentiary hearing alleging that Respondents were told that charitable donation matching was unlimited in amount.

No evidence was offered at the evidentiary hearing in regard to alleged misrepresentations of Claimant regarding the speed of underwriting or in regard to allegedly having been told that the recoupment of the unearned advances referred to as Start-up payments applied only if they left their employment voluntarily.

133. "While actual fraud "has no all-embracing definition," the following essential elements of actual fraud are well established: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974). Additionally, any reliance on the allegedly false representations must be reasonable. *Johnson v. Owens*, 263 N.C. 754, 757, 140 S.E.2d 311, 313 (1965). *Forbis v. Neal*, 361 N.C. 519, 526-27, 649 S.E.2d 382, 387 (2007); *Ragsdale v. Kennedy*, 286 N.C. 130, 138-39, 209 S.E.2d 494, 500 (1974): "…the following essential elements of actionable fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. Johnson v. Owens, 263 N.C. 754, 140 S.E. 2d 311 (1965); Early v. Eley, 243 N.C. 695, 91 S.E. 2d 919 (1956); Vail v. Vail, 233 N.C. 109, 63 S.E. 2d 202 (1951); Insurance Co. v. Guilford County, 226 N.C. 441,

[*139] 38 S.E. 2d 519 (1946); Laundry Machinery Co. v. Skinner, 225 N.C. 285, 34 S.E. 2d 190 (1945); Ward v. Heath, 222 N.C. 470, 24 S.E. 2d 5 (1943); Pritchard v. Dailey, 168 N.C. 330, 84 S.E. 392 (1915).

*Ragsdale v. Kennedy*, 286 N.C. 130, 138-39, 209 S.E.2d 494, 500 (1974).

134. Respondents employment agreements also include merger and modification clauses, as stipulated to by Respondents, to wit:

a. Respondents' Employment Agreements contain merger clauses, stating:

> This Agreement sets forth the entire understanding and agreement of the Parties hereto and fully supersedes any and all prior or contemporaneous agreements or understandings between the Parties with respect to the subject matter hereof. No prior negotiations or drafts of this Agreement shall be used by either Employee or the Company to construe the terms or to challenge the validity hereof.
>
> Respondents' Employment Agreements at ¶ X(A).

b. Respondents' Employment Agreements contain modification provisions, stating:

> This Agreement may not be modified except in writing between all Parties hereto. No oral promises, assurances, agreements, or understandings either prior or subsequent to the execution of this Agreement are binding or may be relied upon except and unless incorporated herein or incorporated by written modification as permitted herein.
>
> Employment Agreement ¶ X(B).

135. As stipulated by Respondents:

"Neither Respondents' Employment Agreements nor their Compensation Schedules contain any provision relating to charitable contributions."

136. Respondents did not testify at the hearing or otherwise provide any evidence at the evidentiary hearing to prove reasonable reliance on discussions with the CEO of Claimant and Mr. Schoolfield as being representations to Respondents of unlimited caps on charitable contributions.

137. Considering the evidence most favorable to the Respondents with every reasonable inference drawn in their favor, the evidence was insufficient and Respondents failed to carry their burden of proof by the greater weight of evidence to support Respondents Amended Counterclaim IV: Fraudulent Inducement, and therefore, Claimant's Motion for Directed Verdict Denying and Dismissing this counterclaim with prejudice was Granted.

**Count V: Breach of Contract: Breach of Implied Covenant of Good Faith and Fair Dealing, namely the common law tort of Wrongful Termination**

138. Respondents' incorrectly declare in their Pre-hearing Brief that this is a case of wrongful termination. (Respondents pre-hearing Brief, dated May 27, 2026, first page, line one: "This is a wrongful termination case."

139. No standalone Wrongful Termination Claim has been asserted in this case.

140. The aforesaid Respondents' employment agreements explicitly state that the employment of the respective Respondent's is "at will". (Claimant's Evidentiary Hearing Exhibits 2 and 7, Team Leader of Employment Contract for each Respondent, Page 1, "Employment. Employee acknowledges the Employee is employed at will and that either the Company of the Employee may terminate this agreement at any time, for any or no reason, with or without cause.")

141. Under North Carolina law, an employee at will can be terminated at any time by an employer with or without reason. (*Gillis v. Montgomery Cty. Sheriff's Dep't*, 191 N.C. App. 377, 379-80, 663 S.E.2d 447, 449 (2008):

> North Carolina courts have consistently held that in the absence of some form of contractual agreement between an employer and employee creating a definite period of employment, "'the employment is presumed to be an 'at-will' employment, terminable at the will of either party, irrespective of the quality of the performance by the other party; '"*Guarascio v. New Hanover Health Network, Inc.*, 163 N.C. App. 160, 164, 592 S.E.2d 612, 614 (2004) (quoting *Harris v. Duke Power Co.*, 319 N.C. 627, 629, 356 S.E.2d 357, 359 (1987)). When an employee has no definite term of employment, he is an employee at will and may be discharged without reason. *Coman v. Thomas Manufacturing Co.*, 325 N.C. 172, 175, 381 S.E.2d 445, 446 (1989) (citing *Still v. Lance*, 279 N.C. 254, [*380] 182 S.E.2d 403 (1971)). "The discharge of an employee at will generally does not support an action for wrongful discharge in this state." *Considine*, 145 N.C. App. at 317, 551 S.E.2d at 181.

142. Respondents contend that their respective terminations were wrongful and without cause and that such terminations constitute the breach of the implied covenant of good faith that is recognized in every contract in North Carolina..

143. North Carolina Courts have expressly denied the recognition of wrongful termination of at will employee as a breach of the implied covenant of good faith and faith dealing. *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 416 S.E.2d 166 (1992); *Salt v. Applied Analytical, Inc.*, 104 N.C. App. 652, 412 S.E.2d 97 (1991), *cert. denied*, 331 N.C. 119, 415 S.E.2d 200 (1992); *English v. Gen. Elec. Co.*, 765 F. Supp. 293 (E.D.N.C. 1991; *Haburjak v. Prudential Bache Sec., Inc.*, 759 F. Supp. 293 (W.D.N.C. 1991

144. Respondents have failed to carry their burden of proof for Respondents' amended counterclaim V: Breach of Contract: Breach of Implied Covenant of Good Faith and Fair Dealing, namely the common law tort of Wrongful Termination, and therefore, Directed Verdict, upon motion of Claimant, was granted Denying this counterclaim and Dismissing it with prejudice.

**Count VI: Violation of the North Carolina Wage and Hour Act**

145. Respondents' motion was granted by the Arbitrator, without objection from Claimant, to substitute violation of the North Carolina and Hour Act for the violation of the Illinois Wage Payment and Collection Act, which was dismissed with prejudice by the undersigned Arbitrator.

146. Even though Respondents' Motion to Amend was granted, without objection, Respondents failed to amend their counterclaim

147. No evidence or arguments whatsoever of such violation was presented by Respondents at the evidentiary hearing.

148. Respondents counterclaim for violation of the North Carolina Wage and Hour Act was abandoned.(*See, Newton v. Astrue*, 559 F. Supp. 2d 662, 670-71 (E.D.N.C. 2008):

> However, Claimant has not briefed this issue nor has she presented it to the Court with any supporting discussion, argument or authority. Moreover, in the concluding paragraph of Claimant's brief, in which she summarizes all grounds for rejecting the ALJ's decision, this particular line of argument is wholly absent. *Id.* at 10. For these reasons, Claimant is deemed to have abandoned argument on this issue. *See Grella v. Salem*

> *Five Cent Sav. Bank,* 42 F.3d 26, 36 (1st Cir. 1994) "[l]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived for purposes of appeal."); *see also Canady v. Crestar Mort. Corp.,* 109 F.3d 969, 973-74 (4th Cir. 1997) (issues raised in notice of appeal but not briefed on appeal deemed waived) (citations omitted); *In re Apex Express Corp.,* 190 F.3d 624, 630 n.5 (4th Cir. 1999) (noting that an issue not argued in appellant's brief is deemed waived on appeal); *Rogers v. Unitrim Auto & Home Ins. Co.*, 388 F. Supp. 2d 638, 641 (W.D.N.C. 2005): "Moreover, as the Defendants point out in their Reply, the Plaintiffs have made no argument concerning their bad faith claim, effectively abandoning it as well."

149. Based on the foregoing, Claimant's Motion for Directed Verdict on said counterclaim was granted and said counterclaim was dismissed with prejudice at the conclusion of the evidentiary hearing.

**ATTORNEY FEES, COSTS AND INTEREST**

150. The "Mutual Agreement to Arbitrate" between each of the Respondents and Claimant provides as follows:

"The terms of this Agreement shall be governed by the Federal Arbitration Act and, to the extent not inconsistent with or preempted by the FAA, by the laws of the State of North Carolina."

151. Pursuant to the express language of the aforesaid arbitration agreements, the Arbitrator is given the discretionary authority to shift the award of attorney fees and costs to the losing party under limited conditions, namely compliance with North Carolina substantive law.

> The arbitrator shall apply state and/or federal substantive law to determine issues of timeliness, liability and damages regarding all claims to be arbitrated. The arbitrator will apply the law of the State of North Carolina to any matter brought before him or her pursuant to this Agreement. The arbitrator is authorized to award any remedy or relief that would have been available to the Parties, in their individual capacity, had the matter been heard in a court having jurisdiction over the claim. The arbitrator shall have the authority to provide for the award of attorneys' fees and costs to the prevailing party if such award is authorized by applicable law.

152. The aforesaid arbitration agreements also include the parties agreement on governing law and allocation of costs, including attorney fees:

> The parties agree that Employer is engaged in transactions involving interstate commerce. We understand and agree that this is an agreement to arbitrate under the Federal Arbitration Act.
>
> We understand and agree that to the extent required by law, Employer will bear the arbitrator's fee and any other type of expense or cost that the Employee would not be required to bear if the dispute or claim was brought in court. as well as any other expense or cost that is unique to arbitration.... Employer and Employee shall each pay their own attorneys' fees in connection with the arbitration, and the arbitrator will not have authority to award attorney fees unless a statute or contract at issue in the dispute authorizes the award of attorneys' fees to the prevailing party, in which case the arbitrator shall have the authority to make an award of attorneys' fees as required or permitted by applicable law.

153. The Compensation Schedule, which is incorporated by reference into the Team Leader Employment Agreement between each Respondent and Claimant provides as follows: "The Parties agree that this Agreement will be interpreted in accordance with North Carolina law."

154. The Federal Arbitration Act is silent in regard to attorney and cost fee shifting, and therefore, does not pre-empt North Carolina substantive law.

155. The Management Conference Report and Scheduling Order in this case provides that North Carolina law governs all substantive legal issues.

156. Fee shifting of arbitration attorney fees are substantive legal issues. (*Pinnacle Grp., Inc. v. Shrader*, 105 N.C. App. 168, 173-74, 412 S.E.2d 117, 122 (1992):"Our Court recognizes that a party's entitlement to attorneys' fees *is* a question of substantive law. *Tolarem Fibers, Inc. v. Tandy Corp.*, 92 N.C.App. 713, 375 S.E.2d 673, *disc. review denied*, 324 N.C. 436, 379 S.E.2d 249 (1989).

157. In regard to fee shifting, the American Arbitration Association Employment/Workplace Rules, which the parties consented and agreed to follow, as set forth in the aforesaid arbitration agreements and the Management Conference Report and Scheduling Order, provides as follows:

(1) R-46. Scope of Award

(a)The arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with applicable law."...

(c) ...The arbitrator may only award administrative fees, arbitrator compensation, or expenses to a business as may be required by applicable law or upon the arbitrator's determination that a claim or counterclaim against the business was filed for purposes of harassment or is patently frivolous.

(2)R-52. Administrative Fees

As a not-for-profit organization, the AAA charges fees to compensate it for the cost of providing administrative services. The fee schedule in effect when the case is filed

shall apply for all fees charged during the administration of the case. The AAA may, in the event of the employee's extreme hardship, waive the employee's administrative fees.

AAA fees shall be paid in accordance with the Employment/Workplace Fee Schedule, found on our website at www.adr.org.

(3) R-53. Neutral Arbitrator's Compensation

Arbitrators shall charge a rate consistent with the arbitrator's stated rate of compensation at the time their AAA resume is presented to the parties for consideration pursuant to Rule R-13(b), unless otherwise determined by the AAA. Such compensation will be consistent with the provisions of the arbitrator's executed Notice of Compensation Arrangements.

Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

Arbitrator compensation shall be paid in accordance with the Employment/ Workplace Fee Schedule.

(4) R-54 Expenses. Unless otherwise agreed by the parties or as provided under applicable law, the expenses of witnesses for either side shall be borne by the party producing such witnesses.

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses

produced at the direction of the arbitrator, shall be borne in accordance with the Employment/Workplace Fee Schedule.

158. The American Arbitration Employment Workplace Fee Schedule, sets out the following provisions for allocation of fees and costs:

7. Arbitrator Compensation:

Arbitrator compensation is not included as part of the

> administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment. The company shall pay the arbitrator's compensation unless the individual, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation.
>
> Arbitrator compensation, expenses, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

159. The Arbitrator has not determined that any claim or counterclaim in this arbitration case was filed for the purpose of harassment or is patently frivolous.

160.. As the prevailing party, Claimant seeks reallocation of costs and attorney fees to the losing parties, Respondents.

161. The costs, exclusive of attorney fees consist primarily of Arbitrator Compensation and American Arbitration Association (AAA) administrative fees.

162.. It is undisputed that Claimant, incorporated as a Limited Liability Company, is a business and Respondents were employees of Claimant.

163. As set forth hereinabove, reallocating Arbitrator Fees and AAA administrative fees from a business to an employee is prohibited by AAA Employment Workplace Rule 46(c) and AAA Employment/Workplace Fee Schedule, incorporated therein by reference, unless there a finding by the Arbitrator that a claim or counterclaim is frivolous or interposed for harassment.

164. North Carolina substantive law provides strict requirements for fee shifting.

165. North Carolina adopts the American Rule:

> North Carolina follows the "American Rule" with regard to awarding attorney's fees against an opposing party. *Ehrenhaus v. Baker*, 243 N.C. App. 17, 23-25, 776 S.E.2d 699. 704-05 (2015).

> Applying the "American Rule", our Supreme Court held over 50 years ago that each litigant is required to pay its own attorney's fees, unless a statute or express agreement between the parties provides otherwise. *In re King*, 281 N.C. 533, 540, 189 S.E.2d 158, 162 (1972); *Stillwell Enterprises, Inc. v. Interstate Equip. Co.*, 300 N.C. 286, 294, 266 S.E.2d 812, 817-18 (1980) (personal property lease agreement); *see also WRI/Raleigh, L.P. v. Shaikh*, 183 N.C. App. 249, 258, 644 S.E.2d 245, 250 (2007) (a commercial real property lease agreement); N.C. Gen Stat. § 42-46(i)(3) (2023) (allows recovery of reasonable attorney's fees in connection with residential rental agreements).*Haythe v. Haythe*, 293 N.C. App. 497, 513, 901 S.E.2d 833, 844 (2024).

166. Under North Carolina law, there must be a statutory predicate to support any exception authorizing fee shifting, such as, NCGS § 6-21, entitled " Costs allowed either party or apportioned in discretion of court".

> Costs in the following matters shall be taxed against either party, or apportioned among the parties, in the discretion of the court:
> (1) Application for years' support, for surviving spouse or children.
> **(2)** Caveats to wills and any action or proceeding that may require the construction of any will or trust agreement, or fix the rights and duties of parties under any will or trust agreement. In any caveat proceeding under this subdivision, the court shall allow attorneys' fees for the attorneys of the caveators only if it finds that the proceeding has substantial merit.
> **(3)** Habeas corpus. The court shall direct which officer shall tax the costs of the proceeding.
> **(4)** In actions for divorce or alimony. The court may, both before and after judgment, make any order respecting the payment of costs incurred by either spouse from the sole and separate estate of either spouse, as may be just.
> **(5)** Application for the establishment, alteration, or discontinuance of a public road, cartway, or ferry. The board of county commissioners in its discretion may assess the costs incurred before the board.
> **(6)** The compensation of referees and commissioners to take depositions.
> **(7)** All costs and expenses incurred in special proceedings for the partition of real or personal property under Chapter 46A of the General Statutes, except that attorneys' fees

shall be assessed in accordance with G.S. 46A-3.

**(8)** In all proceedings under Chapter 156 of the General Statutes relating to drainage, except as otherwise provided in that Chapter.

**(9)** Repealed by Session Laws 2020-23, s. 10, effective October 1, 2020.

**(10)** In proceedings under Article 3 of Chapter 49 of the General Statutes regarding children born out of wedlock.

**(11)** In custody proceedings under Chapter 50A of the General Statutes.

**(12)** In actions brought for misappropriation of a trade secret under Article 24 of Chapter 66 of the General Statutes.

**(13)** In actions for trespass upon real property.

**(14)** In actions against any professional land surveyor as defined in G.S. 89C-3(9) or any person acting under the surveyor's supervision and control for physical damage or economic or monetary loss due to negligence or deficiency in performance of surveying or platting.

The word "costs" as used in this section includes reasonable attorneys' fees in whatever amounts the court in its discretion determines and allows. Attorneys' fees in actions for alimony, however, shall not be included in the costs as provided in this section but shall be determined and provided for in accordance with G.S. 50-16.4.

167. North Carolina General Statute Section 6-21.6, governing the award of reciprocal attorney fee provisions in business contracts expressly excludes employment agreements.

168. There is no statutory predicate under North Carolina law authorizing attorney fee shifting for employment contracts.

169. NCGS §44A-35 sets out the factors to be considered by a judge or arbitrator in determining reasonable attorney fees:

170. NCGS § 44A-35. "Attorneys' fees" sets forth the factors to be considered in determining reasonable attorney fees:

**(a)** In any suit brought or defended under the provisions of Article 2 or Article 3 of this Chapter, the presiding judge or arbitrator may allow a reasonable attorneys' fee to the attorney representing the prevailing party. This attorneys' fee is to be taxed as part of the court costs with the final judgment or arbitration award.

**(b)** The court or arbitrator shall determine the prevailing party based on the principal amount in controversy between the parties as of the commencement of the trial, arbitration, or hearing resulting in a judgment or arbitration award, considering all relevant facts and circumstances.

**(c)** If a party serves (i) an offer of judgment in accordance with G.S. 1A-1, Rule 68, or (ii) a written settlement offer, so that the offer is received at least 30 days before the commencement of the trial, arbitration, or hearing resulting in a judgment or award resolving all matters in controversy between the parties, the last offer shall be deemed to be that party's monetary position for purposes of determining the amount in controversy.

**(d)** In determining the amount of reasonable attorneys' fees and expenses under this section, the court or arbitrator may consider all relevant facts and circumstances, including, without limitation, the following:

**(1)** The amount in controversy and the results obtained.

**(2)** The reasonableness of the time and labor expended, and the billing rates charged, by the attorneys.

**(3)** The novelty and difficulty of the questions raised in the action.

**(4)** The skill required to perform properly the legal services rendered.

**(5)** The relative economic circumstances of the parties.

**(6)** Settlement offers made prior to the commencement of the trial, arbitration, or hearing.

**(7)** Offers of judgment pursuant to Rule 68 of the North Carolina Rules of Civil Procedure and whether judgment finally obtained was more favorable than such offers.

> **(8)** Whether a party unjustly exercised superior economic bargaining power in the conduct of the action or withheld payment of undisputed amounts.
>
> **(9)** The timing of settlement offers.
>
> **(10)** The extent to which the party seeking attorneys' fees prevailed in the action.
>
> **(11)** The amount of attorneys' fees awarded in similar cases.
>
> **(e)** A party may submit evidence relating to an award of attorneys' fees by affidavit or declaration. The court or arbitrator may admit other evidence, including, without limitation, live or deposition testimony. A party may submit expert testimony to support an award, but the court or arbitrator shall not require expert testimony.
>
> **(f)** For purposes of this section, "prevailing party" is the party whose monetary position at the commencement of the trial, arbitration, or hearing is closest to the amount of the judgment or arbitration award. The court or arbitrator shall determine the prevailing party based upon the principal amount in controversy between the parties as of the commencement of the trial, arbitration, or hearing resulting in a judgment or arbitration award, considering all relevant facts and circumstances. (N.C. Gen. Stat. § 44A-35 (Lexis Advance through Session Laws 2026-30 of the 2026 Regular Session of the General Assembly).

171. Even if a statutory predicate for employment contract attorney fees existed, North Carolina common law mandates findings of fact of certain essential factors: "...in order for the appellate court to determine if the statutory award of attorneys' fees is reasonable, the record must contain findings of fact as to the time and labor expended, the skill required, the customary fee for like work, and the experience or ability of the attorney:

> The trial court failed to make any mandated findings: (1) of counsel's rates, as should be set forth in a sworn affidavit; (2) whether those rates were comparable and reasonable for the work done by

> others in the legal market; (3) the subject matter of the case; (4) the experience of the attorney; (5) whether the specific work done and the amounts charged by counsel was reasonable and necessary; and, (6) whether the fees and costs incurred by Plaintiff were reasonable and necessary for the case.
> Plaintiff submitted insufficient evidence of all these factors. There was no affidavit submitted or admitted to evidence.
> *Haythe v. Haythe*, 293 N.C. App. 497, 508, 901 S.E.2d 833, 841-42 (2024)(citing *Cotton v. Stanley*, 94 N.C. App. 367, 369, 380 S.E.2d 419 (1989).

172. No affidavit of reasonableness was offered in this arbitration case.

173. No supporting affidavit was submitted in regard to the itemized attorney fees and costs.

174. Heavily redacted attorney fee itemization, reducing many items to merely generic listing is highly disfavored in North Carolina. (*See*, *Miriam Equities, LLC v. LB-UBS 2007-C2 Millstream Road, LLC*, 2022 NCBC Order 54 (N.C. Super. Ct. July 8, 2022)

175. No affidavit or other evidence of NC or other local market rates for attorney was provided; copies of invoices by their District of Columbia law firm were submitted to Claimant by counsel were the only evidence submitted and such submission was not supported by affidavit.

176. Under North Carolina law, the required customary legal rate refers to the legal market rate within the local geographic market. (*See*, *Vitaform, Inc. v. Aeroflow*, Inc., 2024 NCBC LEXIS 21; 2024 NCBC Order 14:

> The reasonableness of attorneys' fees in this State "is governed by the factors found in Rule 1.5 of the Revised Rules of Professional Conduct of the North Carolina State Bar." *Ehrenhaus v. Baker*, 216 N.C. App. 59, 96, 717 S.E.2d 9 (2011): "The factors to be considered in determining whether a fee is clearly excessive" under Rule 1.5(a) of the Revised Rules of Professional Conduct include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount [*5] involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and(8) whether the fee is fixed or contingent.

*(See, e.g.*, N.C. Rev. R. Prof. Conduct 1.5(a); *Ehrenhaus*, 216 N.C. App. at 96-98).

177. The Arbitrator's June 10, 2026 Procedural Order required a supporting affidavit: "The submission should be presented as a motion for award of attorney fees and costs, including any such applicable law authorizing such fees and costs in this case, and the basis for determining that such attorney fees and costs are reasonable. along with an attached detailed affidavit, itemizing such fees and costs in detail."

178. Supporting affidavit(s) are usually required with or without such procedural Order. (*See, Cotton v. Stanley*, 94 N.C. App. 367, 380 S.E.2d 419 (1989).

179. Insufficient evidence was provided to determine the reasonableness of the petition for attorney fees.

180. Based on the foregoing, including the Arbitrator's discretionary authority, **Claimants petition for costs and attorney fees** should be and is **DENIED**.

**Interest**

181. North Carolina General Statute § 24-5, "Interest on judgments" provides as follows: "(a) Actions on Contracts. — In an action for breach of contract, except an action on a penal bond, the amount awarded on the contract bears interest from the date of breach."

182. The aforesaid statute also provides that the interest shall be at the legal rate. N.C. Gen. Stat. § 24-5 (Lexis Advance through Session Laws 2026-30 of the 2026 Regular Session of the General Assembly).

183. NCGS § 24-1, "Legal rate is eight percent", provides as follows: "Except as otherwise provided in G.S. 136-113, the legal rate of interest shall be eight percent (8%) per annum for such time as interest may accrue, and no more." N.C. Gen. Stat. § 24-1 (Lexis Advance through Session Laws 2026-30 of the 2026 Regular Session of the General Assembly).

184."Whenever a recovery is had for breach of contract and the amount of damages is ascertained from the terms of the contract itself or from evidence relevant to the inquiry, interest should be added." *Harris & Harris Constr. Co. v. Crain & Denbo, Inc.*, 256 N.C. 110, 123 S.E.2d 590, 1962 N.C. LEXIS 430 (1962); *T.C. Allen Constr. Co. v. Stratford Corp.,* 384 F.2d 653, 1967 U.S. App. LEXIS 4878 (4th Cir. 1967); *Rose v. Vulcan Materials Co.,* 282 N.C. 643, 194 S.E.2d 521, 1973 N.C. LEXIS 1136 (1973). N.C. Gen. Stat. § 24-5 (Lexis Advance through Session Laws 2026-30 of the 2026 Regular Session of the General Assembly).

185. Based on the foregoing, **Claimant's Motion for Pre-judgment and Post-judgment interest** should be and is **Grante**d, as follows: Claimant is hereby awarded prejudgment and post judgment interest at the legal rate of 8% from the time of the breach of the aforesaid employment agreements, April 23, 2023 (30 days after March 23, 2023, the last day of Respondents employment with Claimant as set forth in the stipulated finding of fact hereinabove, for calculation of the due date for repayment), until paid in full.

186. Pursuant to the foregoing, as required by aforesaid terms of the Respondents' employment agreements, each of the Respondents should be and are hereby Ordered to repay the unearned wage advance that each of them received upon inception of employment, as follows: (1) Respondent Victor Shkolnikov is hereby Ordered to pay Claimant the sum of $835,000 plus interest at 8% accruing from April 23, 2023 until the date of this Final Award as prejudgment interest, with interest accruing at the same rate thereafter, until paid in full, as post-judgment interest; (2) Respondent Igor Velyunskiy is hereby Ordered to pay Claimant the sum of $400,000 plus interest at 8% accruing from April 23, 2023 until the date of this Final Award as prejudgment interest with interest accruing at the same rate thereafter until paid in full, as post-judgment interest;

***The Arbitrator has considered all evidence and arguments submitted, whether or not expressly referenced in these Findings of Fact and Conclusions of Law. Any finding or***

***conclusion stated herein that may be characterized as a mixed question of fact and law is adopted in the alternative as both a finding of fact and a conclusion of law.***

***To the extent any statement in the Findings of Fact may be deemed a conclusion of law, it is adopted as such; and to the extent any statement in the Conclusions of Law may be deemed a finding of fact, it is likewise adopted as such.***

## FINAL ORDER

## FINAL AWARD

*Based on the foregoing Findings of Fact and Conclusions of Law, the undersigned Arbitrator, Orders, as follows:*

187. This Order constitutes the **Final Award** and **Final Order** in this Arbitration case in regard to any and all claims, counterclaims. defenses and issues in arising out of this Arbitration case.

188. **Claimant's claim against the Respondent Victor Shkolnikov for Breach of Contract** and compensatory damages for repayment of the start- up payment of the principal amount of $835,000 paid to Respondent Shkolnikov as an advance for unearned wages is **GRANTED**.

189. **Claimant's motion for pre-judgment interest and post-judgment interest against Respondent Victor Shkolnikov** is **GRANTED** at the North Carolina legal rate of 8% on the aforesaid principal amount until paid in full.

190. **Claimant's claim against the Respondent Igor Velyunskiy for Breach of Contract** and compensatory damages for repayment of the start-up payment of the

principal amount of $400,000 paid to Respondent Velyunskiy as an advance on unearned wages is **GRANTED**.

191. **Claimant's claim against Respondent Igor Velyunskiy for pre-judgment interest and post-judgment interest** is **GRANTED**, at the legal rate of 8% on the aforesaid principal amount until paid in full.

192. Respondent Victor Shkolnikov shall pay Claimant the sum of $835,000 plus interest at 8% accruing from April 23, 2023, the date of breach, until the date of this Final Award as prejudgment interest with interest accruing at the same rate thereafter until paid in full, as post-judgment interest.

193. Respondent Igor Velyunskiy shall pay Claimant the sum of $400,000 plus interest at 8% accruing from April 23, 2023, the date of breach, until the date of this Final Award as prejudgment interest with interest accruing at the same rate thereafter until paid in full, as post-judgment interest.187. **Count I of Respondents' Amended Counterclaims: Illegal Contract: Truth in Lending Act (TILA) Violation is DENIED and DISMISSED with prejudice.**

194. **Count II of Respondents' Amended Counterclaims**: **Breach of Contract is DENIED and DISMISSED with prejudice**.

195. **Count III of Respondents' Amended Counterclaims: Unjust Enrichment is DENIED and DISMISSED with prejudice.**

196. **Count IV of Respondents' Amended Counterclaims, Fraudulent Inducement is DENIED and DISMISSED with prejudice.**

197. **Count V of Respondents' Amended Counterclaims, Breach of Contract: Breach of implied Covenant of Good Faith and Fair Dealing is DENIED and DISMISSED with prejudice.**

198. **Count VI Of Respondents' Amended Counterclaims, Violation of North Carolina Wage And Hour Act is DENIED And DISMISSED with prejudice.**

199. **Any and all claims of Respondents for damages**, including but not limited to compensatory, exemplary, punitive or any other damages otherwise arising out of the aforesaid counterclaims are **DENIED and DISMISSED with prejudice.**

200. **Any and all claims of Respondents for the award of attorney's fees, costs and interest** are **DENIED and DISMISSED with prejudice**.

201. **Claimant's motion for reallocation of attorneys' fees and costs**, including Arbitrator fees and AAA administrative fees, is **DENIED and DISMISSED with prejudice**; each party shall bear their own costs and attorney fees.

202. The administrative fees and expenses of the American Arbitration Association totaling $5,650.00 shall be borne as incurred, and the compensation and expenses of the arbitrator totaling $182,050.00 shall be borne as incurred.

**So Ordered, this the 27th day of July, 2026**.

H William Constangy

H. William Constangy

Arbitrator